IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 19, 2024

## STATE OF TENNESSEE v. LEIGH KATHERINE LITTLETON

**Appeal from the Criminal Court for Johnson County**
No. 18-CR-81      Lisa N. Rice, Judge
_____

### No. E2023-01329-CCA-R3-CD
_____

The Johnson County Grand Jury charged the Defendant, Leigh Katherine Littleton, and two codefendants by presentment with first degree felony murder, especially aggravated kidnapping, conspiracy to commit especially aggravated kidnapping, extortion, conspiracy to commit extortion, and aggravated assault. Following trial, a jury convicted the Defendant of first degree felony murder, especially aggravated kidnapping, conspiracy to commit especially aggravated kidnapping, extortion, and conspiracy to commit extortion, and the trial court imposed an effective life sentence. On appeal, the Defendant argues (1) the evidence is insufficient to sustain her convictions; (2) the trial court erred in denying the motion to suppress her first statement; (3) the trial court erred in allowing her character to be defamed; (4) the trial court improperly excluded a pre-trial plea offer; and (5) the trial court imposed an unconstitutional condition on her right to present a defense by not allowing her to present proof of her codefendants' criminal histories. After review, we affirm the trial court's judgments.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and TOM GREENHOLTZ, JJ., joined

Cameron L. Hyder (on appeal); Lawrence Scott Shults and Steven R. Finney[1] (at trial), Johnson City, Tennessee, for the appellant, Leigh Katherine Littleton.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Hornsby, Assistant Attorney General; Steven R. Finney, District Attorney General; and Dennis Brooks and Robin Ray, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Steven R. Finney withdrew after he was elected as the District Attorney for the First Judicial District of Tennessee, which includes Carter, Johnson, Unicoi, and Washington Counties.

# OPINION

**Trial.** Haley Coley testified that she knew Robert Littleton and his wife, Defendant Leigh Katherine Littleton. On January 18, 2018, Coley[2] agreed to get Robert[3] and the Defendant a quarter ounce of methamphetamine for $250. Coley met with a seller. However, this seller was unable to get the full amount of methamphetamine and "was acting crazy," so Coley stole the drugs from the seller's home and left. Coley gave the stolen drugs to Robert.

Coley noted that Carlton Edmondson, the victim in this case, had been messaging her "all day," claiming that he could get the drugs. That night, Coley, Robert, and the Defendant met the victim, but when they arrived, the victim did not have the quarter ounce of methamphetamine, and they waited for a different seller to bring the drugs to the victim. When this individual arrived, Robert gave the victim the money, and the victim got into the seller's car and then got out and quickly ran into his house. Coley said that the victim ran inside because he did not have the full amount of drugs and was trying to "stretch" the drugs with "fake stuff."

Coley said that after some discussion, Robert and the victim decided that "it would be best" for the victim to go back with them to the Littletons' camper in Boone. Coley offered to stay with the victim in Drexel, but Robert and the Defendant did not like that option. Coley admitted that she was using drugs heavily at the time and could not recall everything that occurred during that period.

When Robert, the Defendant, Coley, and the victim got close to the Littletons' camper in the early hours of January 19, 2018, Robert and the Defendant put a blindfold on the victim so "he couldn't see where they lived." Coley had been to the Littletons' residence earlier that day, so they did not blindfold her. When they arrived at the camper, Robert made dinner, and the Defendant went to the bedroom to watch television. Robert, Coley, and the victim talked until Robert received a phone call. Robert then instructed Coley and the victim to go to a "little bedroom" in the camper that had bunk beds. As they sat in that bedroom, a man and a woman came to the camper, who were later identified as James Combs and Valerie Dollar. Coley said she could not see Combs and Dollar from where she was, although she could hear their voices. After a while, Robert had the victim come out, and Combs told the victim that he would have handled being ripped off "a lot differently than Robert had." Combs and Dollar left the camper, and Robert, the

---

[2] We will refer to the witnesses by their last name for efficiency purposes, and we intend no disrespect to these individuals.

[3] We will refer to Robert Littleton by his first name throughout this opinion, as he and the Defendant have the same last name.

Defendant, Coley, and the victim all consumed drugs at the camper. During this time, Coley noticed that Robert had some brass knuckles. She noted that after Robert got high from the drugs, his "anger level increased[.]"

Coley stated that later that morning, the victim set up a drug deal with Elizabeth Folsom at a hotel. The Defendant drove the group to Folsom, but Folsom did not have the drugs either. After that, the Defendant drove everyone back to Coley's home in Valdese. When they arrived, Robert got out of the car to let Coley out of the backseat, but he refused to let the victim out of the Defendant's car. Coley asked the victim if he was coming with her, and Robert "said no." Coley went inside her home, and the Defendant, Robert, and the victim left. Later, Coley called Robert to ask where the victim was, and Robert told her they had dropped off the victim in Morganton.

On cross-examination, Coley said the victim robbed Elizabeth Folsom at the hotel and that the victim's uncle, Larry Jenkins, was contacted to "pocket check" the victim to determine whether he had hidden drugs on his person. Coley admitted that Robert was in control of the situation and that the Defendant did not want Coley and the victim to come with them to the camper.

On redirect examination, Coley asserted that the Defendant suggested that Coley and the victim stay in Drexel, but Robert refused. She said Robert wanted the victim to come with him and the Defendant so that the victim could meet Elizabeth Folsom to get the drugs, since the victim had taken Robert's and the Defendant's money, and the victim "needed to make it right" with them. Coley said the Defendant was "very quiet" and "went along with" everything. When Robert and the Defendant gave the victim the money for the original drug deal, the Defendant had the money "in her bra." Coley added, "I just assumed they are husband and wife[,] so it was their money, their situation."

Irea Uebele testified that on January 19, 2018, at approximately 7:30 a.m., she began receiving phone calls from an unfamiliar phone number. When Uebele answered one of these calls, the victim, who was her cousin, told Uebele that they were "going to kill him." Initially, Uebele thought that it was a joke, but the victim told her, "I'm not playing, it's real, this is really happening[.]" A man, later identified as James Combs, took the phone from the victim and said "they wanted back what [the victim] had taken from them." She described Combs as "abrupt" with a "stern" voice. Uebele could hear other people talking in the background and then Combs asked her for $700.

The next time she received a phone call, Uebele spoke to another person, later identified as Robert, who told her he knew where she lived and had her house surrounded. Uebele said she received several phone calls, wherein the victim was "begging" and "crying" that he "want[ed] to come home" and for her to "please help" him. During one

of these calls, the person on the phone told her "they were going to kill [the victim] if [they] didn't get the money." During these calls, she could hear people "beating" the victim, and she heard "female . . . higher pitched voices" saying, "[H]it that n[-----], kick him again, kick him again." During this conversation, which was the last time she spoke to the victim, the victim told Uebele he was "going home" and "sounded like he was dying." After Uebele received these calls, she contacted the victim's parents, Lanisha Kincaid and Robert Pearson, asked them to call the police, and gave them the assailants' phone number.

Uebele said she conducted her own investigation and found the Facebook pages belonging to the codefendants within a day of this incident. She explained that the victim had logged into his Facebook messenger on her cellphone, so she was able to see his messages. Uebele asserted that the Defendant left several messages on the victim's Facebook page, including voice messages. She could tell these messages were from the Defendant based on her name and the photographs on her Facebook page. Uebele said that because the codefendants posted on each other's pages, she was able to determine their names based on "what they were posting and what time they were posting it[.]" She claimed she "knew they were together because they were talking about killing a n[-----]." Uebele said she gave the investigating officers the assailants' phone number as well as all the information she gathered from Facebook.

On cross-examination, Uebele acknowledged that her trial testimony was the first time she asserted that these messages were coming from the Defendant. However, she insisted that the Defendant was the person who sent the messages to the victim because the Defendant's "face was on that Facebook page."

Lanisha Kincaid, the victim's mother, testified that she called the number Uebele had given her and asked if they had the victim. Combs responded, "[Y]es, ma'am." Combs told Kincaid that the victim owed them $700, so they had "roughed him up a little bit." She then asked to speak to the victim, who told her that he had "f[-----] up" because he was supposed to have acquired some drugs for these people, and now they were going to kill him. Although Kincaid initially thought it was a joke, the victim insisted, "Momma, it is not a joke, they are going to kill me." She could tell the victim "was scared."

Kincaid spoke to Combs on the phone several times, noting that Combs had a "real calm" voice that she did not recognize. During these calls, Combs "offered to write a receipt" for the victim, to "drop him off at the hospital," to "give him back to [Kincaid] at McDonalds," and to meet Kincaid at various locations. At the time of these calls, Kincaid could hear other people in the background, including women laughing. Once the police arrived at Kincaid's home, they asked her to go to the station, where Kincaid received approximately three phone calls that she put on speakerphone. She said the last phone call she received was that afternoon, and the victim asked if she was at home, and Kincaid,

without thinking, said she was at home even though she was at the police station. At that point, a man with a different voice took the phone away from the victim and said she was not at home, that they had "eyes" on her; this man then told the victim that his mother did not love him. When Kincaid screamed that she and her family did love the victim, the man on the phone said, "I'm done." Kincaid said she never heard from the victim again after that phone conversation.

Robert Pearson, the victim's father, testified that the victim called him on January 19, 2018. The victim said, "I'm sorry, help me, I need seven hundred dollars." When Pearson replied that he and the victim's mother did not have seven hundred dollars, he heard someone in the background say, "[O]h, that's all I needed to hear" before hanging up. Pearson said he tried to call and text that number several times, but no one ever responded. At the time, Pearson knew Kincaid had also received phone calls from someone stating that they would hurt the victim if they did not get money and claiming that they had surrounded Kincaid's home. Pearson called the police because Kincaid was too scared. He said he never heard from the victim after January 19, 2018.

Michael Branch, a sergeant with the Valdese Police Department in North Carolina, testified that when he got to Kincaid's house, Kincaid received another phone call from Combs' cellphone, and a male voice stated that "he needed seven hundred dollars for the safe return of [the victim][.]" This man said he would call her back with a meeting location so she could give him the money. After this conversation, Sergeant Branch took Kincaid to the police department. He said a second phone call came in from the same number, wherein a male voice stated that he needed to meet Kincaid at McDonald's off I-40 in Mountain City, Tennessee. During this call, Sergeant Branch heard the victim saying, "[M]omma, this is real, . . . do what they say." Kincaid then received a third phone call at approximately 3:00 p.m. while at the police station. During this call, Kincaid said that she was on her way, and the male voice said, "[N]o, you are not, I have got eyes on you" and then could be overheard telling the victim, "[T]hey don't care about you[.]" Sergeant Branch asserted that during these calls, he could hear people in the background, including a female's voice.

Jeremy Brown, an investigator with the Johnson County Sheriff's Department, testified that officers obtained an arrest warrant for Robert Littleton, who was found with the Defendant in a two-door car around 3:00 a.m. on January 20, 2018, in Mountain City, Tennessee. Investigator Brown said officers arrested Robert and took him to the police department. The officers also took the Defendant to the police department. Officers found brass knuckles in the backseat of the police cruiser, where Robert had been transported. Investigator Brown stated that the North Carolina State Bureau of Investigation interviewed the Defendant at the station. Following this interview, the Defendant went with Investigator Brown to an area in Johnson County at the base of Stone Mountain where

the victim was last seen. Investigator Brown noted some disturbances in the leaves and vegetation in this area and observed a reddish-brown substance, possibly blood, that was collected and sent to the Tennessee Bureau of Investigation for testing. He said he was at the Stone Mountain location at 6:49 a.m. and that the temperature gauge on his vehicle stated that it was fourteen degrees outside at that time.

Matthew Cress, an investigator with the Johnson County Sheriff's Department, testified that he searched for the victim on the ground and from the air but was unable to locate the victim. Investigator Cress also helped process and collect evidence from the crime scene at the base of Stone Mountain.

Scott Lott, a Special Agent for the Tennessee Bureau of Investigation, testified that he executed a search warrant on the Defendant's "small sedan type car" with two doors. He stated that a wallet containing the Defendant's driver's license was found in the car. In addition, officers found a cellphone with a purple case underneath the car on the passenger side. Special Agent Lott conducted an extraction on this cellphone and found two videos on it that were made on January 19, 2018, at 7:35 a.m. and 3:53 p.m., respectively. He also extracted a call log from this cellphone.

Nathan Anderson, an Assistant Special Agent in Charge at the North Carolina State Bureau of Investigation, was accepted as an expert in the field of digital forensic analysis. Special Agent Anderson testified that he conducted a data extraction of Combs's cellphone. He stated that the data showed that Combs had deleted sixty text messages. In addition, Combs had deleted his calls to Kincaid, Uebele, and Pearson from his call log. In addition, this data showed calls between Robert and Combs around 4:30 a.m. on January 19, 2018. It also showed that Combs called Dollar twice around 7:30 a.m. on January 19. Special Agent Anderson was also able to extract a photograph from Comb's cellphone that depicted the victim standing upright in front of a house with trash on the ground.

On cross-examination, Special Agent Anderson stated that he did a physical extraction, the highest level of data extraction, on Combs's cellphone because that would retrieve all data, including deleted information, from that phone. He did not recall using a Faraday bag to preserve this data while he was doing the extraction.

Mary Holder, an investigator for the North Carolina State Bureau of Investigation, testified that she assisted Special Agent Ronald Crawley with this case. Agent Holder said she and Agent Crawley went to the Valdese Police Department to meet with Lanisha Kincaid, the victim's mother, who informed them of the phone calls she had received concerning the victim. They discovered that Haley Coley had been with the victim, and they interviewed Coley. The information provided by Coley led law enforcement to start looking for Robert. Agent Holder said they also obtained some video footage from

Walmart in Boone taken at approximately 10:30 p.m. on January 19, 2018, which depicted the Defendant, Robert, and another woman, later identified as Brittany Arnold, inside the store.

Agent Holder said they began looking for a 2005 Dodge Dakota pickup truck driven by Valerie Dollar. She noted that a truck matching the description of Dollar's truck was captured on video surveillance near the North Carolina and Tennessee state line.

On cross-examination, Agent Holder confirmed that Elizabeth Folsom, who was not charged in this case, had sent some threatening messages to the victim's Facebook account. She agreed that Folsom had sent the victim messages threatening to kill the victim after Coley and the victim robbed her at the motel in Boone.

Ronald Crawley, a Special Agent with the North Carolina State Bureau of Investigation, testified that after speaking to the victim's mother at the Valdese Police Department, he and Agent Holder began trying to identify the owner of the phone who had been calling the victim's mother.

Investigator Crawley obtained the phone records from Combs, Dollar, May, Robert, Pearson, Kincaid, and Uebele. These records confirmed that Combs's phone called Kincaid, Uebele, and Pearson. These records also confirmed that the last call on January 19, 2018, at 2:49 p.m. to Kincaid was from Robert's phone. Investigator Crawley said that Dollar's Facebook records showed numerous messages and calls between Robert and Dollar, including some messages around 1:00 p.m. on January 18, 2018, when Robert asked Dollar if she had a $100 to "throw down" with them, and at 1:05 a.m. on January 19, 2018, when Robert asked Dollar to go to his house.

Investigator Crawley also obtained the Defendant's Facebook records. On January 18, 2018, at 1:58 p.m., the Defendant messaged someone called "Joshie Squashie," wherein the Defendant stated, "Waiting, . . . Need a $100 to get something. U wouldn't happen to have a 100 I can borrow. We'll make it worth it or give your money right back[.]" Approximately one minute later, the Defendant messaged Squashie again, stating "Lol nevermind [sic] we got it." On January 19, 2018, at 6:17 p.m., Lizzie Isaac messaged the Defendant, asking, "Y'all ever get good?" After some messaging back and forth, the Defendant replied to Isaac: "Not tonight. We had a situation that we had to fix[,] and it took all day long[.]" On January 23, 2018, the Defendant messaged Tychella Ervin, who said she was the victim's cousin. In these messages, the Defendant told Ervin that the victim had "f[--]k[ed]" them over, and that they wanted to teach the victim "a lesson."

Investigator Crawley said he and Agent Chris Munden with the North Carolina State Bureau of Investigation interviewed the Defendant at approximately 3:30 a.m. on January

20, 2018, and this interview, which was audio recorded, lasted over two hours. He said the Defendant agreed to talk with them, and her interview took place in a "fairly large room" with "multiple desks" in the Johnson County Sheriff's Office. The Defendant sat in a chair "closest to the door" while the officers sat "further back" in the "corner of the room." Investigator Crawley said they spoke to the Defendant from a few feet away and told the Defendant that "she was free to leave" and that "she could come and go as she pleased." During this interview, the Defendant was wearing a hoodie that "she kept pulling over her mouth," which made it difficult to hear her at times.

An audio recording of the Defendant's interview was admitted at trial and played for the jury. At the beginning of this recording, the officers asked the Defendant if she knew why they wanted to speak to her. The Defendant replied, "[The victim] stole money" from her and her husband. She said she and Robert had been with Coley, and they planned to buy seven grams of methamphetamine from the victim for $200. However, the victim only got 2.5 grams of the drug, and then the victim tried to cut it with salt to make it look like the full seven grams. The Defendant said they caught the victim before he could do that and informed him that they "either wanted the rest of the dope or the money." They asked the victim if he wanted to go back to their camper with them or to stay. The Defendant claimed the victim voluntarily went with them to their trailer "to make things right." At that point during the interview, an officer informed the Defendant that if she needed to use the bathroom, "the door's right there, you're welcome to leave." The officer then said, "Obviously, you're not in handcuffs, you're not under arrest or anything like that, and like I said, I appreciate you[r] being willing to talk."

The Defendant continued to answer questions, stating that she and Robert had already paid $200, and the victim used it to get the 2.5 grams, so that money was gone. She told the officers about driving to their camper, the other unsuccessful drug transactions, and dropping off Coley at home. The Defendant said the victim remained with them because he had not provided the drugs or money he owed them. She stated that they later met with Dollar, Combs, and May. The Defendant and Dollar went to Combs's house, while Robert, May, and Combs took the victim somewhere. After a short time, the Defendant messaged Robert asking him where he was. Fifteen to twenty minutes later, Robert, May, and Combs arrived at Combs's home with the victim.

The Defendant stated that they had called the victim's family to ask for $700. She claimed the victim's debt had gone from $200 to $700 to account for their time and gas as well as the street value of seven grams of methamphetamine. She also told the officers that the missing 4.5 grams was the debt to be paid, not the $200. The Defendant claimed that nothing was going to happen to the victim if they did not get the money, but she later admitted they told the victim they would not take him home until he supplied the drugs.

- 8 -

She also admitted she was present when Robert sent photographs of the victim to his family.

The Defendant said that although the victim's mother agreed to deliver the money, she never showed up. By then, Brittany Arnold had joined them to go to Mountain City. After waiting a while for the victim's mother, they drove down a back road near Boone. The Defendant admitted that they were trying to leave the victim in the middle of nowhere around 4:00 p.m. While the Defendant initially claimed she did not know whether the victim had a cellphone, she eventually admitted that someone had taken the victim's phone. When they stopped, Robert told the victim to "get the f[--]k out."

During this interview, the Defendant alternatively claimed that no one hit the victim; that Arnold shoved the victim; that May pushed the victim away from the truck; that Robert pushed and slapped the victim; that Arnold hit and kicked the victim in the face; that Robert hit the victim in the face; and that Robert and Arnold used the brass knuckles to hit the victim a couple of times. She also asserted that, at most, the victim suffered a black eye, a bloody lip, and a "knot" on his forehead. The Defendant acknowledged that Arnold and the victim "got into it" earlier that day, explaining that Arnold pushed the victim, and the victim responded by punching Arnold.

The Defendant also told the officers that Robert and Arnold made the victim apologize to her and Robert for not delivering the full amount of the drugs. She said she asked the group not to kill the victim or beat him up badly. She admitted her group left the victim, who was lying down on his stomach in the fetal position. She noted that the victim was "not very much a fighter." The Defendant claimed the victim was moving and sobbing as they drove away. Later that night, the Defendant, Robert, and Arnold went to Walmart to cash a check. At the conclusion of the interview, the Defendant agreed to show the officers where they had left the victim. When they got to the Stone Mountain location, the officers noted that there were no footprints leading away from the area with the reddish-brown stains, which led the officers to question whether the group really left the victim there. The Defendant acknowledged that Robert videoed the victim being beaten up on his cellphone. She said the cellphones belonging to her, Robert, and the victim should be in her car.

After the audio recording on the Defendant's interview was played for the jury, Investigator Crawley's testimony continued. On cross-examination, he confirmed that Combs's cellphone called Lanisha Kincaid around 7:40 a.m. on January 19, 2018, and that Robert's cellphone called Kincaid at 2:42 p.m. on the same date. Investigator Crawley agreed that it was a male voice that spoke to Kincaid during the 2:42 p.m. phone conversation. He also said that the Facebook records showed that on January 19, 2018, at 7:58 a.m., the Defendant asked Robert, "Where are you?"

Investigator Crawley stated that during her interview, the Defendant disclosed that Robert hit the victim with his brass knuckles twice and then Brittany Arnold hit the victim with brass knuckles and then kicked the victim in the face. The Defendant claimed she asked them not to kill the victim and not to beat him badly. Investigator Crawley said that based on the context of the Defendant's admissions, this took place at the Stone Mountain location where the second video was filmed. The Defendant also stated that the group left the victim lying down, which was consistent with what the second recording depicted. Investigator Crawley stated that he drove the Defendant to an area at the base of Stone Mountain at approximately 6:30 a.m. on January 20, 2018.

Jillian Welker, a Special Agent Forensic Scientist at the Tennessee Bureau of Investigation, was accepted as an expert in the field of forensic analysis. Agent Welker stated that she tested the swab submitted from the access road and concluded that the substance contained human blood with DNA from an unknown male. She stated that she conducted additional testing, comparing this sample to DNA from Pearson and Kincaid, the victim's parents, and concluded that the blood from the access road likely came from the victim.

The State recalled Investigator Brown. He stated that Dollar's truck was captured by a security camera going over the state line between Mountain City, Tennessee and Boone, North Carolina around 4:00 p.m. on January 19, 2018. He also identified two photographs from the cellphone in the purple case that were found underneath the Defendant's car. One photo depicted Robert and another photo depicted the Defendant. Investigator Brown also identified the victim's shoes, which were found by officers at the residence of Stacey May after May was questioned. In addition, he identified a photograph of the victim that was extracted from Combs's cellphone. Based on his investigation, Investigator Brown believed that the victim had picked up trash from the May residence on January 19, 2018, after May's mother had been cited for improper disposal of garbage around her home.

Investigator Brown said that when he went with the Defendant to the area in Johnson County at the base of Stone Mountain where the victim was last seen, he noticed two sets of tire tracks. He said that despite receiving multiple tips and investigating every lead, they were never able to locate the victim's body.

The two videos that were extracted from Robert Littleton's phone were played for the jury. The first video recording, which was made on January 19, 2018, at 7:35 a.m. on Joe Wallace Road off US 421 near Combs's residence, depicted the victim lying on the ground in the snow, curled up. Investigator Brown identified the voices of Robert, May, Combs, and the victim on the first recording. During this video, the victim apologized and pled with the other men. The men tried to call Uebele, but it went to her voicemail. The

- 10 -

victim then told the men to text Uebele that "this is Lovii," referring to himself. Uebele called back a minute later, and the victim told her that he needed to borrow money to pay a bill before going to work. The victim told the men Uebele would not provide the money if he did not go talk to her. After this call ended, Robert told the victim, "One stupid thing goes wrong, . . . auntie is going to be laying out here because I don't f[--]king play games and neither do my home boys." Robert then said, "This is my home boys, this is what the f[--]k we do . . . Lucky your ass ain't dead yet, . . . going to be a long day, son." The men called Uebele back, with the cellphone on speakerphone. Combs talked to Uebele and then handed the phone to the victim, who told Uebele that he stole money and was in trouble. Then Combs took the cellphone back and gave Uebele directions for delivering money. During this video recording, all three men were heard laughing and threatening the victim.

The second video recording was made at 3:53 p.m. on January 19, 2018, in the Stone Mountain area where the officers found the reddish-brown stains. Investigator Brown identified the voices of Arnold, Robert, Dollar, and the victim. The recording depicted the victim crouched on the ground, with a spot of blood in the snow beside him. The victim had blood on his forehead, his face appeared bruised, and he had blood caked on the back of his head. The victim apologized and told the Defendant that he was "thankful" for her, but then Arnold kicked the victim in the face, and he fell backward. Arnold then threatened the victim, stating, "Disrespect her and her husband again, and I swear . . . you and your momma both will die." Then Arnold stated, "Now, y'all ready? Let the son of a bitch walk outta [sic] here." As footsteps walking away were heard, Dollar said, "Felt good, didn't it?" Near the conclusion of this recording, Robert stated, "Don't f[--]k with us again, boy. You understand me?" The recording depicted the victim lying on the ground, not moving. At the very end of this recording, the camera showed the license plate of Dollar's truck.

Three still shots taken from this second recording were admitted into evidence. One of these still shots depicted trauma to the top of the victim's head as well as bruising to his face. The second still shot depicted Brittany Arnold delivering a kick to the victim's face. The third still shot showed the victim falling backward after receiving the kick from Arnold.

Investigator Brown stated that he interviewed the Defendant at her camper on January 22, 2018. An audio recording of this interview was played for the jury. During this interview, the Defendant reiterated that it was the victim's decision to get in their car. She said Robert, Combs, May, and the victim showed up at Combs's home, and they said the victim's family was going to send money for the victim. Then they all went to May's mother's home and had the victim clean up the yard. The Defendant said Arnold showed up with another girl in a green Mustang, and Arnold decided to hang out with them. The group told the victim's mother to bring money to Mountain City around 3:00 p.m. on Friday

if she wanted to get the victim back, but the victim's mother never showed up. The Defendant said the group discussed leaving the victim in the middle of nowhere. At that point, Arnold said the victim hit her and suggested they take the victim to property owned by Arnold's family. Then the Defendant, Robert, Arnold, Dollar, May, and the victim went to Arnold's property, which was near Grove Reece Road. Combs said that he was going to help the girl with the green Mustang bail her boyfriend out of jail and then meet them there. Once they got to Arnold's property, Arnold and Robert beat up the victim, and Arnold kicked the victim in the face around 4:00 p.m. The victim remained conscious and was either crying or talking to them. The Defendant said they left the victim on the gravel road and then returned to Combs's house, but he was not there. The Defendant said that Combs would have been able to find the spot where they left the victim. She said Combs was the most likely to go to the location where they left the victim. The Defendant showed the officers the first video showing Robert, May, and Combs taking the victim somewhere earlier in the day and the second recording showing the group leaving the victim on the mountain. The Defendant said the group went back to Mountain City around 5:00 p.m. and then went back to May's home. She said they then returned to Combs's home.

Investigator Brown confirmed that on January 19, 2018, at 6:17 p.m., Lizzie Isaac sent the Defendant the Facebook message, "Y'all ever get good?" He explained that Isaac's message was "indicative of drug trafficking" because it referred to whether the Defendant had "a certain product or quantity of product." He said that on January 19, 2018, at 8:06 p.m., the Defendant replied to Isaac, "Not tonight. We had a situation that we had to fix[,] and it took all day long[.]" He confirmed that the Defendant sent this reply prior to Robert's arrest.

On cross-examination, Investigator Brown acknowledged that around the same time as the first video was taking place with Combs, Robert, and May, the Defendant sent a message to Robert asking, "Where are you?" He also acknowledged that the Defendant told him during her interview that she had asked Robert not to hurt the Defendant and that she was "scared" of Robert, Combs, and May. He admitted that although the Defendant was only four feet, eleven inches tall and weighed 130 pounds, Robert was six feet tall and 168 pounds; Combs was six feet tall and 268 pounds; and May was five feet, ten inches tall and 210 pounds. Investigator Brown agreed that the Defendant, despite her fear, still solidified the State's case against all the codefendants when she spoke to law enforcement, took them to the location on Canter Road where the victim's blood was found, and agreed to a search of her car and the cellphone containing the videos. He acknowledged that the victim in one of the videos said to the Defendant that he was "thankful for [her], actually."

Investigator Brown opined that the victim was not free to leave from the moment he got into the car in Drexel with Coley, the Defendant, and Robert. He believed things "escalate[d]" when the victim was blindfolded and when James Combs appeared at the

camper. However, he acknowledged that Combs was not present during the second video recording. He noted that after Combs was arrested, a search of his car revealed a rolled-up carpet, bleach, and carpet cleaner inside.

The defense presented Sara Petty, a scientist with Archer Hall Forensics, who was accepted as an expert in the field of forensic digital examination. Petty reviewed the "call detail records" for James Combs and Stacey May, but she never received these same call records for Robert Littleton because the North Carolina State Bureau of Investigation never requested them within the cellular provider's retention period.

Based on these records, Petty determined the estimated location of May's phone on January 19. She stated that the second video recording was made at 3:53 p.m. on January 19, 2018 and that from approximately 4:30 p.m. to 5:50 p.m., May's phone was in the Mountain City area and then it traveled south. Petty was unable to get the same GPS data for Combs's cellphone or Robert Littleton's phone based on the prior data extractions for these devices.

Petty had concerns about Special Agent Anderson's extraction methods for the cellphones, claiming Anderson should have performed "each extraction method that is supported for a device" to ensure that all data was extracted. She asserted that Anderson should have used a Faraday bag for the extractions, which would have ensured that no network or wireless signals could connect to the device.

Petty reviewed the Defendant's and the victim's Facebook accounts. She "did not find any communications" between the Defendant and the victim.

On cross-examination, Petty said she did not realize that Special Agent Lott did the original data extraction from the cellphones. She acknowledged that Lott had not been asked whether he used a Faraday bag to avoid losing evidence on the cellphones; however, she claimed that a Faraday bag should have been used for each extraction of data. Petty stated that the Defendant, during her interview, had placed herself with May during that period from approximately 4:30 p.m. to 5:50 p.m.

The defense also presented testimony from Larry Jenkins, the victim's uncle, who testified that he saw the victim the night of January 18, 2018, in Drexel. He noted he also saw the Defendant and Robert Littleton there but insisted that the environment was calm and not hostile. Jenkins said he overheard something about drugs being "short." He smoked some marijuana while he was there and asked the victim if he wanted to leave with Robert and the Defendant. Jenkins claimed he never would have left the victim with them if he did not think the victim would be safe. On cross-examination, Jenkins admitted he never saw the victim after he left the victim in the company of Robert and the Defendant.

The Defendant testified on her own behalf. She stated that she was married to Robert Littleton. She said that prior to this incident, she had been incarcerated for drug use, entered a drug rehabilitation program in prison, and had gotten clean. However, when Robert began using methamphetamine after being required to wear an alcohol monitor following his DUI conviction, the Defendant began using methamphetamine again.

The Defendant stated that on January 17, 2018, Haley Coley told Robert that Coley "could get cheaper dope off the mountain where she was from." On January 18, 2018, Robert lined up a drug deal with someone else, but it fell through. Robert went to Coley's home and talked to her about setting up a drug deal with someone she knew. The first deal Coley arranged was with a guy who claimed he had seven grams of drugs but only had three grams. Coley brought the drugs to the Defendant and Robert in their car, and then Coley robbed that guy of his drugs.

The Defendant said Coley then set up a drug deal with the victim, who claimed he could give them a quarter ounce of methamphetamine for $200. They went to the trailer of the victim's friend in Drexel, and the victim said he no longer had the drugs, but his cousin could get the drugs for them. The victim later obtained a smaller amount of drugs from someone else, but he attempted to cut the drugs with salt to make it look like a larger amount, which was discovered by Robert and the Defendant. After that, Coley called the victim's uncle, Larry Jenkins, to ensure that the victim was not hiding any more drugs on his person.

The Defendant said that initially the victim was going to call them the next morning to tell them whether he would be "able to make it right" by getting the rest of the drugs, but Coley suggested that the victim either go with the Defendant and Robert or stay with Coley. Although Robert wanted the victim to go with them, the Defendant wanted Coley and the victim to stay behind in Drexel. The Defendant said the victim "made the final decision" to go to Robert and the Defendant's camper in Fleetwood, North Carolina. She said they blindfolded the victim so he would not know how to get to their home but did not blindfold Coley, who had already been to their camper. The Defendant noted that by the time they got to their camper, Robert was "mad."

When they arrived, Robert cooked dinner for everyone, and they all used drugs. The Defendant was not hungry because she had been using methamphetamine, so she went back to her room, and later Valarie Dollar and James Combs arrived at their camper. The Defendant did not go out to talk to them, and she was not "paying attention to what was going on out there." The Defendant explained that the plan was that once the victim's phone was charged, he would make some calls trying to obtain more methamphetamine for them. Later, Robert informed the Defendant that Combs said Robert was "handling the situation better than he would have." A short time later, Combs and Dollar left the camper.

Once his phone was charged, the victim set up a meeting with Elizabeth Folsom to get more methamphetamine. Robert, the Defendant, Coley, and the victim met Folsom at a motel, and the victim stole the drugs from Folsom. Then they went to Coley's home, where Robert realized that the methamphetamine was mixed with sugar and became angry. Robert asked Coley to get out of the car, and then had the Defendant drive him and the victim to meet Dollar, Combs, and May. When they got there, Robert asked the Defendant to go with Dollar. The Defendant said, "I knew that my husband was really mad and . . . I couldn't really talk him out of anything at that point in time. But I did ask him not to kill [the victim]." The Defendant claimed she told Robert that "somebody's life was not worth money or drugs," and she explained that she had "lost a cousin that way." Robert assured the Defendant that he "wouldn't let it go that far" and encouraged the Defendant to get into Dollar's truck.

The Defendant stated that she and Dollar went to Combs's home to wait for the others, while the victim went with Robert, Combs, and May. She claimed she did not know what the men were doing or where they went. After the men were gone for a while, the Defendant messaged Robert to ask where he was. Approximately thirty minutes later, the men returned with the victim, who was "shaken up." Robert told the Defendant that the victim had "asked his family for money to pay back what he owed[.]" However, the Defendant claimed to not know about the extortion. The Defendant believed that this issue with the victim was going to end soon because the money would arrive, and everyone would go their separate ways.

The Defendant noted that the victim and either Robert, Combs, or May would step outside to make phone calls, which made her wonder what was going on. The Defendant said she later "nagged and pestered" Robert about what was going on after she saw that Robert took a photograph of the victim. At that time, the Defendant was not aware that the first video recording of the victim had been made by the men. Robert claimed the photograph was so that the victim's family would know the victim was "okay."

The Defendant said that the group later took the victim to May's home, which was within walking distance of Combs's house. While there, the victim was forced to pick up trash in May's yard. The Defendant said Brittany Arnold joined them and knew where to get drugs, so they all got in Dollar's truck and went to Mountain City. Prior to going to Mountain City, the Defendant heard that Brittany Arnold and the victim had gotten into a physical altercation earlier that day.

At that point, Dollar, Arnold, the Defendant, the victim, May, and Robert were together, and Arnold and Robert began talking about taking the victim to Arnold's property to beat him up. Arnold persuaded Robert to go to her property, so they all drove there in Dollar's truck. The Defendant described the ride to Arnold's property as hostile, and she

- 15 -

was concerned about what Robert and Arnold might do to the victim when they got there, so she reminded Robert about not hurting the victim too badly. The Defendant said that no one in the truck listened to her, and she did not feel in control of the situation. She said the victim was aware that she did not want him hurt badly or killed.

When they arrived at Arnold's property on Canter Road, Arnold and Robert got out of the truck, and Robert instructed the victim to "get the f[--]k out.." They exited the truck, and Robert and Arnold "beat down" the victim with some brass knuckles. Robert and Arnold took turns hitting the victim, and then Arnold "superman punched" the victim "in the back of the head." During this time, the victim apologized to the Defendant and told the Defendant that he was "thankful" for her. Someone in her group suggested that they make the victim walk out of the area, so they left him there.

The Defendant said that she became aware of the first video recording after her husband was arrested. However, she was present when the second video recording of the victim was made. The Defendant said that Combs was not present for the second recording and that Combs was not present when they returned to Combs's home after abandoning the victim. She was not aware of what Combs was doing at the time.

The Defendant said that she, Robert, and Arnold stopped at a few other places before going to Walmart at 10:00 p.m. that night so she could cash a check. They made a couple of other stops to make drug deals, and then they drove back to Mountain City, where Robert was arrested. The Defendant allowed the officers to search her car and their cellphones, and then she agreed to talk to Investigator Brown at the sheriff's department. At approximately 6:45 a.m. on January 20, 2018, the Defendant agreed to take officers to Canter Road, where the second video recording of the victim was made and where they had left the victim. While there, the Defendant pointed out the location of the victim's blood on the ground.

The Defendant asserted that Robert and Dollar had given the money for the initial drug deal with the victim. She stated that she was afraid of Combs, May, and Robert. She also noted that, at times, her husband Robert could be "pretty scary."

On cross-examination, the Defendant said that although she told officers that the victim had "ripped off" her and Robert, she claimed she only included herself because they were "a couple." The Defendant insisted that the victim had only taken Robert's and Valerie Dollar's money, not hers.

The Defendant stated she "tried to discourage" Robert from hurting the victim at various times. She added, "There was not much I could do except maybe I could have argued more." The Defendant said that when they dropped off Coley at her home and

Robert refused to allow the victim to go with Coley, she knew the victim was not free to leave. She claimed she was "scared" of her husband at that time, so she tried to convince him not to kill the victim.

The Defendant admitted that at the end of the second video, she and her group left the victim lying on the ground, not moving, and not crying, in cold temperatures and miles away from civilization. She asserted, "I didn't want them to do any[]more harm to [the victim] than they had already done." The Defendant maintained that she did not want the victim to be severely beaten, that she wanted the victim to fight back, and that she did not like it when the victim was being held down and kicked. She claimed she was "very sorry" about what happened to the victim. The Defendant acknowledged that she knew something was wrong when she brought the officers to the scene where the victim had been abandoned, and they did not see the victim's body or the victim's footprints leading away from the scene.

At the conclusion of trial, the jury convicted the Defendant of first degree felony murder, especially aggravated kidnapping, conspiracy to commit especially aggravated kidnapping, extortion, and conspiracy to commit extortion, and the trial court imposed an effective life sentence. The Defendant timely filed a motion for new trial, alleging that the trial court erred in failing to suppress her first statement to police; that her character was incurably defamed when Irea Uebele testified that the Defendant "levied a specific racial slur at the victim via Facebook messenger"; that the trial court denied her right to present a defense when it excluded evidence of the pre-trial plea offers to all codefendants, which provided for a dismissal of the murder charge for anyone who could provide the location of the victim's body; that the trial court denied her right to present a defense and placed unconstitutional conditions on her rights when it excluded the codefendants' violent or criminal histories; that the trial court erred in denying her motion for judgment of acquittal; and that the verdict was contrary to the weight of the evidence. The trial court denied the motion for new trial on August 21, 2023, and the Defendant filed a timely notice of appeal on September 19, 2023.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that the verdict was contrary to the weight of the evidence presented at trial and that the trial court erred in failing to grant her motion for judgment of acquittal because the proof was insufficient to sustain her convictions. Specifically, she asserts that the State's case relied on the testimony of codefendants, who were motivated to implicate her in exchange for favorable pleas deals; that the physical evidence did not conclusively establish her involvement in the crimes; that there was substantial proof suggesting that another codefendant was the principal actor

in the crimes and that the Defendant's involvement in the crimes was minimal. In response, the State contends that the Defendant is not entitled to relief because the codefendants did not testify and there was ample proof establishing the Defendant's involvement in the crimes. We conclude that the evidence is sufficient to sustain all her convictions.

Initially, we must address the Defendant's claim that the jury's verdict was contrary to the weight of the evidence in this case. Tennessee Rule of Criminal Procedure 33(d) states that "the trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." See State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995) (holding that the trial court has a duty to serve as the thirteenth juror). Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment. Id. Otherwise, appellate review is limited to the sufficiency of the evidence pursuant to Rule 13(e) of the Tennessee Rules of Appellate Procedure. State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). Here, the record clearly shows that the trial court agreed with the jury's verdict as the thirteenth juror. The transcript shows the trial court explicitly stated, "As the thirteenth juror, approving the verdict of the jury in this case, the Court finds that there is sufficient proof to substantiate the jury's verdict." Accordingly, the Defendant is not entitled to relief on her claim that the verdict was contrary to the weight of the evidence in this case.

The Defendant also contends that the trial court erred in failing to grant her motion for judgment of acquittal because the proof was insufficient to sustain her convictions. To appeal a denial of a motion for judgment of acquittal at the close of the State's case-in-chief, a defendant must stand on the motion and decline to present any evidence. State v. Collier, 411 S.W.3d 886, 892 (Tenn. 2013). If the defendant fails to stand on his motion, the issue is waived on appeal. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007). Because the Defendant presented proof following the denial of her first motion for judgment of acquittal, she has waived her right to appeal the trial court's denial of her first motion. See id. at 317 (refusing to revisit the waiver rule); see also State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998) (holding that "[t]his court may not return to the midpoint of the trial and then order the trial court to direct a judgment of acquittal upon the basis of the record as it then existed.").

Next, we consider whether the trial court erred in denying the motion for judgment of acquittal at the close of all proof. We recognize that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence

after a conviction[.]" State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); Ball, 973 S.W.2d at 292; State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Because the standard of review is the same for the Defendant's claim that the trial court erred in denying his motion for judgment of acquittal and her claim that the evidence is insufficient to sustain the convictions, we will analyze these issues at the same time.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

At trial, the State presented the theory that the Defendant was guilty of the charged offenses under a theory of criminal responsibility. Criminal responsibility is "'not a separate, distinct crime'" but "'a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.'" State v. Davidson,

509 S.W.3d 156, 214 (Tenn. 2016) (quoting State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Therefore, criminal responsibility for the actions of another person "requires that a defendant act with a culpable mental state, specifically, the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997) (quoting Tenn. Code Ann. § 39-11-402(2)). "A person acts with intent as to the nature or result of conduct when it is that person's conscious objective or desire to engage in the conduct or cause the result." Id. (citing Tenn. Code Ann. § 39-11-302(a); State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

In the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing Ball, 973 S.W.2d at 293). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." Id. (citing Ball, 973 S.W.2d at 293). There is no requirement that the State "elect between prosecution as a principal actor and prosecution for criminal responsibility[.]" State v. Hodges, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) (citing State v. Williams, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)).

The Defendant claims that there is insufficient evidence to sustain her convictions for first degree felony murder, especially aggravated kidnapping, conspiracy to commit especially aggravated kidnapping, extortion, and conspiracy to commit extortion. First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping[.]" Tenn. Code Ann. § 39-13-202(a)(2). Therefore, to sustain the Defendant's conviction for felony murder in this case, the State was required to prove that the Appellant killed the victim in the perpetration of a kidnapping. See id.

Especially aggravated kidnapping is defined as false imprisonment "[c]ommitted to hold the victim for ransom or reward[.]" Id. § 39-13-305(a)(3). Kidnapping is defined as false imprisonment "under circumstances exposing the other person to substantial risk of bodily injury." Id. § 39-13-303(a). The crime of false imprisonment is committed by one "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). The offense of conspiracy is committed "if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating the commission of an offense, agree that one (1) or more of them will engage in conduct

that constitutes the offense." Id. § 39-12-103(a). "No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." Id. § 39-12-103(d).

As pertinent in this case, "a person commits extortion who uses coercion upon another person with the intent to . . . [o]btain property[.]" Id. § 39-14-112(a)(1). "Coercion" is defined as "a threat, however communicated, to . . . [c]ommit any offense[.]" Id. § 39-11-106(a)(3)(A). The Defendant was also charged with conspiracy to commit extortion. See id. §§ 39-12-103(a), -103(d).

The evidence, when viewed in a light most favorable to the State, was sufficient to establish the Defendant's guilt for the conviction offenses under a theory of criminal responsibility. Regarding her first degree felony murder conviction, there was abundant proof that the victim was killed during the Defendant's perpetration of the especially aggravated kidnapping. In addition, there was sufficient proof that the Defendant was guilty of especially aggravated kidnapping and conspiracy to commit especially aggravated kidnapping. The proof showed that the Defendant gave the victim the money for the original drug deal. While the Defendant testified at trial that the money for this drug deal came from Robert and Valerie Dollar, the Defendant admitted to officers during her interviews that the victim "stole money" from her and her husband. During her interviews, the Defendant provided various justifications for the harsh increase in the victim's debt from $200 to $700, acknowledged that she and Robert told the victim that he could not go home until he either gave them the money or the missing drugs, and admitted that Robert and Brittany Arnold made the victim apologize to her regarding the drug transaction. The evidence also established the Defendant was aware that the victim was confined in her car, that the victim was forced to perform yard work at May's residence, and that the victim was restricted to the bunk bed area of her camper because of the drug transaction. The Defendant was aware that Combs and Robert had demanded a ransom from the victim's family members in exchange for the victim's release. The Defendant rode in a truck with the victim and most of the other codefendants to a remote mountain location where Arnold and Robert brutally beat the victim and abandoned him in freezing temperatures. The Defendant admitted that she was present during this brutal assault and was present when the victim was abandoned on the mountain. The Defendant made no attempt to separate herself from the other codefendants or to aid the victim. The victim was never found following this incident, and the proof is sufficient to show that the victim died during the kidnapping.

The Defendant's Facebook messages also established her involvement in the victim's especially aggravated kidnapping, which led to the victim's death. Prior to obtaining drugs from the victim, the Defendant sent a message to "Joshie Squashie" asking

if he had $100.  At 8:06 p.m. on January 19, which was after they abandoned the victim but before Robert was arrested, the Defendant messaged Lizzie Isaac, "We had a situation we had to fix[,] and it took all day long."  In addition, the Defendant also sent messages to Tychella Ervin, the victim's cousin, stating that the victim had "f[--]k[ed]" them over, and that they wanted to teach the victim "a lesson."

Based on the Defendant's involvement in the victim's kidnapping, her presence at the drug transaction through the victim's assault and abandonment, her failure to render aid to the victim after the assault, and her companionship with the codefendants before and after this incident, a rational jury could find beyond a reasonable doubt that the Defendant was criminally responsible for the kidnapping offenses as well as the felony murder of the victim.  See State v. Dollar, No. E2023-00531-CCA-R3-CD, 2024 WL 2353940, at *8 (Tenn. Crim. App. May 23, 2024) (concluding that Dollar was criminally responsible for the kidnapping of the victim because she communicated with and was present with the codefendants during the kidnapping, was present when the victim was being confined, threatened, and ordered to perform yard work, was aware that the victim was being held for ransom, assisted the codefendants by providing a truck to take the kidnapped victim to a location where he was assaulted and left unconscious, and accompanied the codefendants to the location and encouraged codefendant Arnold in assaulting the victim as the victim pleaded for his life); State v. Patton, No. E2013-01355-CCA-R3-CD, 2014 WL 1512830, at *6 (Tenn. Crim. App. Apr. 16, 2014) (concluding that the evidence was sufficient to sustain the defendant's convictions for especially aggravated kidnapping and criminally negligent homicide under the theory of criminal responsibility where the defendant was with the group who kidnapped the victim and remained at the location where the victim was being held for ransom).

As for the Defendant's convictions for extortion and conspiracy to commit extortion, the jury could have reasonably found that the Defendant was guilty of both offenses.  The Defendant observed Robert taking photographs of the victim to send to his family.  In addition, the Defendant was present when the second video was made, where several codefendants, including Robert and Brittany Arnold, brutally beat the victim and abandoned him on the mountain in freezing temperatures.  During her second interview with law enforcement, the Defendant repeatedly stated that the plan was to have the victim's family meet "them" with money and that she agreed with the other codefendants regarding this plan.  Therefore, a rational jury could also find beyond a reasonable doubt that the Defendant was criminally responsible for the extortion and conspiracy to commit extortion offenses.

Significantly, the Defendant does not argue that the State failed to prove specific elements for each conviction offense.  Instead, she claims that the codefendants in this case had strong motivations to implicate her in exchange for favorable plea deals, which raised

serious questions about the reliability of their testimonies. She also asserts that the trial court should have considered the codefendants' bias when assessing the sufficiency of the evidence. See Napue v. Illinois, 360 U.S. 264, 269 (1959) ("[T]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."). Ultimately, the Defendant asserts the verdicts were not supported by the weight of the evidence, given the questionable credibility of the codefendants' testimonies. However, because the trial transcript shows that none of the Defendant's codefendants testified at trial, the Defendant is not entitled to relief on this claim. To the extent that the Defendant argues that the codefendants' statements were not reliable because they were motivated to implicate her to receive favorable plea deals, we conclude that the codefendants' statements were not presented at trial and that there was abundant proof showing the Defendant's guilt of the conviction offenses.

The Defendant also claims that the lack of corroborating physical evidence in this case further undermines the sufficiency of the evidence against her, specifically noting that forensic analysis and other physical proof failed to directly link her to the actions that led to the victim's death. See State v. Crawford, 470 S.W.2d 610, 613 (Tenn. 1971) ("In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone."). However, we recognize that "the defendant need not have taken a physical part in the crime in order to be held criminally responsible." Watson, 227 S.W.3d at 639 (citing Ball, 973 S.W.2d at 293). As noted above, there was abundant proof that the Defendant was criminally responsible for the conviction offenses.

Finally, the Defendant contends there was reasonable doubt about her guilt because the defense presented substantial evidence suggesting another codefendant was the principal actor in the crimes. As we outlined above, there was abundant proof of the Defendant's guilt in this case, particularly under the theory of criminal responsibility.

We reiterate that it was the jury's duty to evaluate the credibility of witnesses, to determine the weight given to testimony, and to resolve all conflicts in the evidence. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We will not reweigh the evidence nor substitute our inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297. Accordingly, we conclude that the trial court did not err in denying the motion for judgment of acquittal at the close of the defense's proof because the evidence was sufficient to sustain all the Defendant's convictions.

**II. Suppression of Statements.** Next, the Defendant contends that the trial court's admission of her statements to police violated her Fifth Amendment rights and severely

- 23 -

impacted the fairness of her trial. She claims that the officers' failure to administer <u>Miranda</u> warnings rendered her statements inadmissible and that the circumstances surrounding her interrogation indicated a coercive environment that likely influenced her statements. In particular, the Defendant argues that the arrest of her husband created "significant psychological pressure." The State responds that because the Defendant waived this issue by failing to provide an adequate record for review, this court must presume that the trial court properly denied her suppression motion. Alternatively, the State asserts that based on the limited appellate record, the Defendant failed to prove she was in custody when she gave her first statement to police. We conclude that the Defendant has waived this issue and is not entitled to plain error review.

We note that the Defendant failed to include a transcript of the suppression hearing in the appellate record and that the trial court's written order stated only that the suppression motion was denied "[f]or reasons stated on the record." The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." <u>State v. Roberts</u>, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing <u>State v. Groseclose</u>, 615 S.W.2d 142, 147 (Tenn. 1981); <u>State v. Jones</u>, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." <u>State v. Bibbs</u>, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing <u>Smith v. State</u>, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); <u>Vermilye v. State</u>, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). Because of the absence of an adequate record here, we must presume that the trial court's denial of the Defendant's suppression motion was supported by the evidence.

Finally, we note that the Defendant never filed a reply brief addressing the State's allegation of waiver regarding the suppression issue and never asked for plain error review of this issue. Therefore, we conclude that the Defendant is not entitled to plain error review of this issue. <u>See</u> Tenn. R. App. P. 36(b); <u>State v. Bledsoe</u>, 226 S.W.3d 349, 355 (Tenn. 2007).

**III. <u>Defamation of the Defendant's Character.</u>** The Defendant also asserts she was defamed by Irea Uebele, who falsely testified that the Defendant used a racial slur against the victim via Facebook messenger. She claims the trial court's delayed limiting instruction, which was given in response to this false testimony, resulted in a violation of the Defendant's right to a fair trial. She claims the damage to her character caused by this false testimony was irreparable, and the jury's perception of her was unduly influenced by this error. In addition, the Defendant asserts that the prosecution had an obligation to

immediately correct the record and ensure that the jury was not misled by the false testimony. See Napue, 360 U.S. at 269 ("[T]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness."); Berger v. United States, 295 U.S. 78, 88 (1935) ("[T]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."). In response, the State argues that the Defendant waived this claim by agreeing to the trial court's remedial actions after this testimony, by failing to appropriately cite to the record, and by failing to develop her argument. We conclude that the Defendant has waived this claim on multiple grounds and is not entitled to plain error review.

Near the end of her testimony at trial, Uebele stated that the victim had previously logged into his Facebook Messenger account on her phone, so she was able to see his messages. She noted the Defendant had left several messages on his Facebook page, including several voice messages. Uebele stated that she knew the messages were from the Defendant based on her name and the photographs on her Facebook page. She claimed she had discovered the Defendant's name, as well as the other codefendants' names, and was able to identify them based on "what they were posting and what time they were posting it." Uebele said she knew the Defendant and codefendants were together because they posted on one another's Facebook pages, so she "knew they were together because they were talking about killing a n[-----]." On cross-examination, Uebele acknowledged that her trial testimony was the first time she asserted that the messages were coming from the Defendant. There was no objection during Uebele's testimony.

The morning of the second day of trial, the Defendant filed a motion to compel discovery, arguing that the messages sent by the Defendant, which were referenced by Uebele during her testimony the prior day, had not been disclosed in discovery. The prosecutor replied that the messages had been previously provided in discovery, but Uebele "got the two females mixed up," and Elizabeth Folsom had sent these messages, not the Defendant. The prosecutor explained that Folsom testified during Robert's trial and suggested that defense counsel explore this issue during his cross-examination of Agent Holder because Agent Holder was "the one who obtained" the Facebook records and would be able to clarify that Folsom sent the messages, not the Defendant.

The trial court asked counsel if this issue could be remedied with a written stipulation that Uebele's testimony on this issue was inaccurate because the Defendant did not send any messages to the victim. Defense counsel expressed his concern that in this jury trial charging the Defendant with "first degree murder involving an African[]American

male victim," Uebele had pointed at the Defendant and had accused the Defendant of stating, "[W]e are going to get that n[-----]." The trial court asked if a written stipulation, read to the jury, would clarify Uebele's testimony because it did not know how else to fix this issue. When the trial court questioned whether Uebele could be recalled, a prosecutor replied that Uebele had left following her trial testimony and was currently in Indiana. A second prosecutor asserted that Agent Holder would be testifying for the State and could explain on cross-examination that the person who sent those messages was Elizabeth Folsom and not the Defendant. The trial court asserted, "I think it needs to be made abundantly clear that [the] testimony [on this point] was incorrect because [Uebele] did say it was [the Defendant's] picture on these messages[.]"

Defense counsel asserted he needed to have a discussion with the Defendant about how to proceed and about whether she wanted to move for a mistrial, and he was given a few moments to talk to the Defendant. Thereafter, defense counsel announced that he and co-counsel talked to the Defendant about the possibility of moving for a mistrial and about "how [in]credibly damning [Uebele's] testimony was to the jury," but the Defendant had decided that she did not want them to make a motion for a mistrial on her behalf. Defense counsel also talked to the Defendant about a potential curative instruction regarding Uebele's testimony. He then summarized defense counsels' conversation with the Defendant and asked the Defendant on the record, "Is it your desire for us not to make that motion for mistrial and proceed with this case?" The Defendant responded affirmatively. Thereafter, the trial court drafted a brief curative instruction to be read to the jury at that time.

When the jury returned to the courtroom, the trial court provided the following curative instruction:

> Ladies and gentlemen, I need to address a matter that came up yesterday. All of you will remember the State's first witness, Ms. [Irea] Uebele . . . Do you remember, all of you remember the first witness, [the] small lady testified first that she was referred to as auntie but was actually a cousin to the alleged victim in this case, [and she referred to the victim] frequently . . . yesterday as Lovii? . . . Do you recall Ms. Uebele referencing messages that she received or that she saw or [were] accessed by her on [the victim's], Lovii's Facebook? Alright. All of you remember that testimony. She clearly testified that those messages came from [the Defendant], do you all recall that? Do you also recall that the messages were of a threatening nature and had racial slurs involved? That has been reevaluated and investigated over the evening[,] and it has been determined and checked with the investigators that were pertinent to that part of this case that those messages did not come from [the Defendant] in any respect. All right. Those

messages were sent from another person by the name of Elizabeth Folsom. [The Defendant] had nothing to do with those messages. Ms. Uebele's testimony was wrong or incorrect. You can judge her credibility in all other respects[,] but it has been agreed by both [the] State and defense that her testimony in that respect was wrong[,] and those messages are in no way to be attributed to [the Defendant]. She did not draft them, send them[,] or have anything to do with them[.]

Does that satisfy the inquiry? We will likely do a written stipulation that part of her testimony would be redacted. Thank you.

The trial court then asked if there was anything else from the State or the defense or any questions from the jury, and no one responded. During a bench conference, defense counsel asked that the trial court also inform the jury that Elizabeth Folsom was not one of the six codefendants charged in this case and that Folsom would not be testifying at the Defendant's trial.

The trial court then instructed the jury:

You also recall the names of the other people who are charged in this case that are involved in separate proceedings from [the Defendant]. Ms. Folsom is not one of those charged individuals. She was involved in extraneous matters on this case, [and] she will likely not even be a witness. So she is not one of the defendants charged.

When one of the jurors asked if Elizabeth Folsom accessed the Defendant's Facebook, the trial court replied:

No, No. It was not [the Defendant's] Facebook, it had nothing to do with [the Defendant]. [The Defendant] had no contact with those messages whatsoever. There is no proof and the State does not assert in any way that [the Defendant] authored those messages, authorized them, sent them or that it came even by an unauthorized means through her messenger or her Facebook. I am not very . . . social media savvy, so I'm not good at that kind of thing. Basically[,] the messages that Ms. Uebele referenced did not come from [the Defendant] and she had nothing to do with them nor did any of her social media have anything to do with it, it was not her picture as testified to. Okay.

The trial court asked if this prior instruction satisfied the defense, and Defendant's attorney replied, "Yes, Your Honor, thank you."

Later, defense counsel stated that it had sent the written stipulation regarding Uebele's testimony to the prosecution, and the prosecutor announced that it had agreed to this stipulation. The trial court stated that it would include it in the jury instructions as an agreed stipulation. Copies of this stipulation were read to and provided to both parties. The following stipulation was given to the jury during the jury charge and included in the written jury instructions:

State and Counsel for Defendant stipulate that the testimony of Irea Suionne Uebele regarding the sending of Facebook calls or messages by [the Defendant] Leigh Katherine Littleton to [the victim] Carlton Edmondson (Lovii's) Facebook account, accessed by Ms. Uebele, was wrong. It is agreed and stipulated by State and Defense that any such messages were sent by Elizabeth Folsom.

[Irea] Uebele testified on 7/19/2022 concerning messages sent to the Facebook account of Carlton Edmondson (aka Lovii).

Uebele stated she had access to Carlton Edmondson's personal Facebook account because Mr. Edmondson previously logged into his personal Facebook account using Uebele's phone.

Uebele testified these messages contained threats and racial slurs directed at Carlton Edmondson. She stated she was certain these messages came from Ms. Leigh Katherine Littleton.

After evaluation and investigation, it has been determined that those messages did not come from Ms. Littleton in any respect.

Those messages were sent by another person named Elizabeth Folsom[]. Elizabeth Folsom[] is not one of the individuals charged in this case. Elizabeth Folsom[] sent those messages from her own Facebook account to Carlton Edmondson's Facebook account.

Leigh Katherine Littleton had nothing to do with those messages. Those messages are in no way to be attributed or connected to Ms. Littleton. Ms. Littleton did not draft them, send them, or have anything to do with those messages.

Therefore, Uebele's testimony was wrong or incorrect. The jury is to judge her credibility in all other respects.

- 28 -

The Defendant claims Uebele's false testimony that the Defendant used a racial slur against the victim was unexpected and highly prejudicial because it portrayed the Defendant as a "person of vile character, capable of racial animus." She claims that although she objected to Uebele's false testimony and requested an immediate curative instruction, the trial court delayed its response until the next morning, which left the jury with the false impression that the Defendant had made the racial slur against the victim overnight. The Defendant also claims the prosecution did not correct the record, which further compounded the prejudicial against the Defendant.

While the Defendant asserts that the prosecutor failed to correct the record in this case, which caused additional prejudice, we disagree. When the parties originally discussed the issue the morning prior to the second day of trial, the prosecutor immediately acknowledged that Uebele was mistaken when she testified that the Defendant sent the messages. The prosecutor later agreed to the stipulation. In addition, Agent Holder acknowledged on cross-examination that Elizabeth Folsom was the individual who sent the messages, including the racial slur, to the victim over Facebook. Finally, Sara Petty testified that she had reviewed the Facebook messages for both the victim and the Defendant and determined that there had been no communication between them.

Despite her claims to the contrary, the record shows the Defendant did not immediately object to Uebele's testimony and that the defense first raised the issue the morning prior to the second day of trial. The parties addressed the issue, and the trial court gave the Defendant and her attorneys time to decide how to proceed. Ultimately, the Defendant stated on the record that she wanted to continue with the trial and did not want her attorneys to move for a mistrial. Thereafter, the Defendant, through counsel, ultimately agreed to the trial court's suggestion of a stipulation the next day. Thereafter, the trial court provided an oral curative instruction, which was agreed to by both parties. The court then included a written stipulation in the jury charge, which was also agreed to by the prosecution and the defense. Because the record clearly showed that the Defendant agreed to both the curative instruction and the stipulation, she has waived this issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The Defendant also waived this issue by failing to make any references to the record regarding this issue. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief,

with citations to the authorities and appropriate references to the record . . . relied on[.]"). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)).

Lastly, the Defendant never filed a reply brief addressing the State's allegation of waiver and did not ask for plain error review of this issue. Accordingly, we conclude that the Defendant is not entitled to plain error review. See Tenn. R. App. P. 36(b); Bledsoe, 226 S.W.3d at 355.

**IV. <u>Denial of Right to Present a Defense.</u>** The Defendant asserts that the trial court improperly excluded the State's pre-trial plea offer to the codefendants, which would dismiss the felony murder charge in exchange for information about the victim's remains. She claims the court's exclusion of this plea offer evidence violated her constitutional right to present a complete defense because the plea offer was "essential to demonstrate the potential bias and motivations of the codefendants who testified against her at trial." See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). The Defendant also asserts that the exclusion of this evidence prevented her from presenting a defense and challenging the credibility of her codefendants' testimony. The Defendant also claims that although the trial court relied on Tennessee Rule of Evidence 408 to exclude the evidence of the plea offer, Rule 408 should not be applied in a manner that infringes on a defendant's constitutional right to present a complete defense. United State v. Scheffer, 523 U.S. 303, 308 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)) (State rules excluding evidence from criminal trial "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"). In response, the State argues that the Defendant has waived this claim by failing to support her argument with appropriate references to the record, by failing to include the relevant standard of review, and by failing to include a transcript of the motion hearing where the parties addressed the admissibility of this plea offer. Waiver notwithstanding, the State asserts the Defendant is not entitled to relief. We conclude that the Defendant has waived this claim on multiple grounds and is not entitled to plain error review.

The record shows the State filed a motion in limine, seeking to exclude "any evidence" or "reference" to unaccepted plea offers. The record does not show a response from the Defendant. However, the record does show that the trial court entered an order noting that this motion was heard on March 17, 2022, and granting this motion in limine "[w]ithout objection."

Initially, the Defendant has waived this issue by failing to include a transcript from the March 17 hearing and by failing to include the transcript of the motion for new trial

hearing in the appellate record. See Tenn. R. App. P. 24(b) (The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."); Roberts, 755 S.W.2d at 836 ("Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue."); see also Dollar, 2024 WL 2353940, at *9; State v. Sims, 45 S.W.3d 1, 15 (Tenn. 2001). Because the Defendant failed to include the transcripts relevant to this issue, we must presume that the trial court's grant of this motion in limine was supported by the evidence. Bibbs, 806 S.W.2d at 790 (citing Smith, 584 S.W.2d at 812; Vermilye, 584 S.W.2d at 230).

In addition, the Defendant waived this issue because the trial court's order shows that the State's motion in limine was granted "without objection" from the defense. Because the record clearly shows that the Defendant failed to object regarding the State's motion and failed to make an offer of proof, she also has waived this issue on this ground. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

We also agree with the State that the Defendant has waived this claim by failing to support her argument with appropriate references to the record and by failing to include the relevant standard of review. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]"). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Schaller, 975 S.W.2d at 318 (citing Hammons, 737 S.W.2d at 552).

Lastly, the Defendant never filed a reply brief addressing the State's allegation of waiver and never asked for plain error review of this issue. Therefore, we conclude that the Defendant is not entitled to plain error review. See Tenn. R. App. P. 36(b); Bledsoe, 226 S.W.3d at 355.

**V. Unconstitutional Condition.** As her final issue, the Defendant argues that the trial court erroneously held that she could not present evidence of her codefendants' violent and criminal backgrounds until she testified and confirmed her knowledge of the codefendants' backgrounds, which created an unconstitutional condition forcing her to choose between her right to remain silent and her right to present a defense. See Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) ("To punish a person because he has

done what the law plainly allows him to do is a due process violation of the most basic sort[.]"); Chambers, 410 U.S. at 294 ("[T]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). The Defendant asserts that the trial court's ruling infringed on her right to present a complete defense and impacted the fairness of her trial because this evidence was crucial to establishing that one of her codefendants was the principal actor in the crimes. In response, the State asserts that the Defendant waived this claim by abandoning it at trial, by not supporting her argument with appropriate references to the record, and by not including a standard of review. We conclude that the Defendant has waived this claim on multiple grounds and is not entitled to plain error review.

Prior to trial, the State filed a motion in limine to exclude "proof of convictions of co-defendants." Attached to this motion was an email from the Defendant's attorney, stating that he intended to elicit testimony on cross-examination regarding the criminal convictions of Stacy May, James Combs, and Robert Littleton, codefendants in this case. The defense filed a response to the State's motion, arguing that exclusion of this evidence would deny the Defendant's right to present a defense.

The State's motion in limine was addressed at the end of the first day of trial. Defense counsel said he intended to elicit prior convictions of Robert, Combs, and May during his cross-examination of Investigator Brown because Brown "looked into the criminal backgrounds" of the codefendants as a part of his investigation. He asserted that this criminal conviction evidence was relevant because it helped determine whether the Defendant could do anything "to control these individuals[.]" He noted that at the time of the offenses, the Defendant was less than five feet tall and weighed 130 pounds while the codefendants were "full grown men" with "violent histories[,]" which dramatically impacted the Defendant's ability to "to control or persuade" these men." After the State suggested that the Defendant would have to show some knowledge of the codefendants' criminal histories before this evidence should be admitted, defense counsel replied,

> . . . I don't think we should condition [the Defendant's] right to remain silent with her right to a defense. To say that she would have to testify to talk about what she knew about [the codefendants'] history before we are able to even bring this up, we are conditioning one constitutional right on another.

After hearing the parties' arguments as to this issue, the trial court held that the Defendant's knowledge about her Codefendants' criminal backgrounds was relevant and would not confuse the jury. The trial court then stated:

> I think it is proper cross[-]examination fodder to ask any witness that the State puts on about what [the Defendant] knew about [the codefendants], if

the State's witnesses know, and what [the Defendant's] familiarity with those individuals [was]. If she had seen [the codefendants] beat up other people, if she had seen them engage in violent behavior to others or to herself, you know, if she was abused as a wife[, these things] would be relevant to the amount of control that would be exercised by Mr. Robert Littleton over this [D]efendant. So those things can become material based upon the development of the proof.

However, the trial court reserved ruling on the defense's use of the codefendants' specific convictions until it could see how the proof developed.

The Defendant asserts that her attorney sought to introduce proof of her Codefendants' criminal backgrounds not only to illustrate the Defendant's state of mind but also to suggest that another Codefendant was the principal actor in the crimes in this case. She claims the trial court's exclusion of this evidence prevented the jury from fully considering the defense's theory, which resulted in an unfair trial.

Initially, we conclude that the Defendant waived this issue by abandoning it at trial. Here, the trial court ruled in the Defendant's favor and allowed her to cross-examine any witness about the Defendant's knowledge of her codefendants' criminal histories. Because the record shows that the Defendant never sought to introduce proof of the codefendants' criminal histories at trial, other than a brief mention of Robert's prior DUI, and never made an offer of proof regarding the specific evidence she sought to admit, she has waived this issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The Defendant has also waived this claim by failing to support her argument with appropriate references to the record and with appropriate citations and argument regarding the standard of review. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . . relied on[.]"). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Schaller, 975 S.W.2d at 318 (citing Hammons, 737 S.W.2d at 552).

Lastly, the Defendant never filed a reply brief addressing the State's allegation of waiver and never asked for plain error review of this issue. Therefore, we conclude that

the Defendant is not entitled to plain error review.  See Tenn. R. App. P. 36(b); Bledsoe, 226 S.W.3d at 355.

## CONCLUSION

Based on the foregoing analysis, the judgments of the trial court are affirmed.


s/             Camille           R. McMullen
CAMILLE R. MCMULLEN, PRESIDING JUDGE